UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LARRAINE REEVES MORRISON, | Case No: 2:18-CV-0054-TOR |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| ANTHONY H. FAVERO AND MARCENE K. FAVERO, a married couple, | |
| Defendants. | |

BEFORE THE COURT are Defendants Anthony H. Favero and Marcene K. Favero's Motion to Dismiss for Lack of Jurisdiction (ECF No. 10) and Motion to Dismiss for Lack of Complete Diversity (ECF No. 16) and Plaintiff Larraine Reeves Morrison's Motion to Shorten Time, Strike, Allow Sur-reply, and for Oral Argument (ECF No. 31). The Court held an oral hearing on July 13 after initial briefing was completed.

At the hearing, the Court raised the issue of ownership under Revised Code of Washington (RCW) 62A.2-401, the statute governing the passing of title for a sale of goods, and the effect it may have on the causes of action. The Court gave Plaintiff the option to file a non-suit or provide supplemental briefing on the effect of RCW 62A.2-401. Plaintiff thereafter filed a Supplemental Response with accompanying declarations (ECF Nos. 36, 37, 38) and Defendants filed a Supplemental Reply (ECF No. 40).

The Court has reviewed the record and files herein, and is fully informed. For the reasons discussed below, Defendants Motion to Dismiss for Lack of Jurisdiction (ECF No. 10) is **granted**. Defendants alternate Motion to Dismiss (ECF No. 16) is **denied** as moot. Plaintiff's Motion to Shorten Time, Strike, allow Sur-reply and for Oral Argument (ECF No. 31) is **granted in part** and **denied in part.**

## STANDARD OF REVIEW

"Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation and internal quotation marks omitted). While "a plaintiff may not simply rest on the bare allegations of the complaint", "uncontroverted allegations must be taken as true, and conflicts between parties

over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.* (citation, internal quotation marks, and brackets omitted).

Plaintiffs seeking to bring suit in federal court under diversity jurisdiction must, if challenged, demonstrate the jurisdictional amount – over $75,000, exclusive of interest and costs – is met. 28 U.S.C. § 1332(a); *In re Ford Motor Co./Citibank (S. Dakota), N.A.*, 264 F.3d 952, 957 (9th Cir. 2001). However, the standards for determining the amount favor the plaintiff, as a dismissal is only proper when it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount . . . ." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

## BACKGROUND[1]

The instant action arises out of the death of "Indio," a horse purchased by Plaintiff Larraine Reeves Morrison from Defendants Anthony H. Favero and Marcene K. Favero of the Moses Lake Horse Exchange.

Plaintiff resides in Burbank, California. Plaintiff is very "passionate about animal welfare" and has been involved in animal rescue for five years. ECF No.

---

[1] The following allegations are taken as true for the purposes of this Motion, and are gleaned from Plaintiff's Revised Amended Complaint (ECF No. 7-1) and affidavits provided by Plaintiff in opposition to Defendants' Motion to Dismiss.

21 at ¶¶ 6, 9. Plaintiff founded "Made for Manes" to raise awareness about the capture and slaughter of America's wild horses; Made for Manes "arranges and hosts fundraisers to raise money on behalf of organizations that help buy slaughter-bound horses and place them in safe, loving homes." ECF No. 21 at ¶ 13. At some time during Plaintiff's animal rescue activities, Plaintiff met Marla Ward of Thunder Mountain Farms Equine Rescue (TMFER), a non-profit corporation in Washington that rescues horses and adopts them out for a fee. ECF Nos. 21 at ¶ 10; 22 at ¶ 2-3. Plaintiff provides financial support to TMFER. ECF No. 21 at 2, ¶¶ 9-10.

Plaintiff relayed to Ms. Ward that she "wanted to acquire a particular kind of horse. [She] wanted a flashy, black and white horse with white face markings and different colored eyes." ECF No. 21 at ¶ 14. Ms. Ward, along with Helen Ardire (a volunteer working with TMFER) reached out to Defendants to acquire the horse. ECF Nos. 21 at ¶ 15; 22 at ¶ 7. Ms. Ward told Defendants they were acquiring the horse for "a very important TMFER supporter" who "could be key to the future success" of TMFER. ECF No. 22 at ¶¶ 6-7, 10. At the same time, Ms. Ward (1) asked Plaintiff if she would consider an unhandled, young horse captured off the Colville reservation and (2) offered to find a horse trainer, to which Plaintiff said "yes." ECF No. 22 at 8. Ms. Ward then contacted Taylor Gordon, a trainer then

living in Ellensburg, Washington, to evaluate the suitability of a potential horse. ECF No. 22 at ¶ 9.

After Defendants found a horse matching the description, Defendants notified Ms. Ward, who sent a picture of the horse to Mr. Gordon and Plaintiff; Plaintiff "immediately fell in love with him" and "asked TMFER to coordinate the transaction of purchase." ECF No. 21 at ¶ 17; 22 at ¶¶ 10-13. "At that time, it was communicated to Ms. Ardire to ensure that Mr. Favero knew the Hollywood donor, Ms. Reeves, would be purchasing the horse." ECF No. 22 at ¶ 13. Plaintiff then arranged for Taylor Gordon, an expert horse trainer, to begin the horse's training and care for the horse, which would start after Defendants delivered the horse to him in Oregon, where he moved his operation. ECF No. 21 at ¶¶ 18-19.

On January 17, 2018, while the horse was still in Moses Lake in Defendant's possession, a local veterinarian performed certain testing necessary for interstate transportation. ECF No. 21 at ¶¶ 20-21. The "Equine Infectious Anemia Laboratory Test" form completed that day lists Plaintiff as the owner, ECF No. 21 at 8, and the "Certificate of Veterinary Inspection" listed Plaintiff as the consignor and consignee, ECF No. 21 at ¶ 25. Ms. Ward explains that "TMFER . . . provided Ms. Reeves's name and contact information to the Defendants, who passed it along to Dr. Higgins." ECF No. 22 at ¶ 16. TMFER then confirmed the price: an ungelded stud for $450, cost of veterinary services for the Coggins test, health

certificate, and brand inspection for $250, and hauling the horse to Taylor Gordon in Oregon for $300.  ECF No. 22 at ¶ 17.

Around that time, Plaintiff "learned from Ms. Ward that Mr. Gordon insisted that Indio be gelded prior to delivery."  ECF No. 21 at ¶ 22.  Plaintiff "specifically informed Ms. Ward that a veterinarian [should] perform Indio's castration[.]"  ECF No. 21 at ¶ 22.  According to Ms. Ward, she had a discussion with Anthony Favero about the castration, who apparently agreed the horse would be gelded by a veterinarian.  ECF No. 22 at ¶ 18.

On January 20, 2018, Plaintiff sent $1,000.00 to Ms. Ward via Paypal "with the intention that she would then pay $1,000 to Defendants for the costs related to selling, testing, and transporting [the horse]."  ECF No. 21 at ¶ 23; 22 at ¶ 21.[2]  TMFER then sent $1,000.00 to Defendants via PayPal.

On January 24, 2018, Defendants drove the horse to Mr. Gordon's facility in Oregon.  ECF No. 22 at ¶ 24.  After delivery, Ms. Adire spoke with Mrs. Favero about remaining charges for a halter, a vaccine, and the cost for gelding.  ECF No. 23 at ¶ 17.  Ms. Adire asked Mrs. Favero about a receipt from the veterinarian for

---

[2]     Plaintiff sent TMFER $1,000.00, but a fee was deducted and TMFER only received $977.70.  ECF No. 21 at 10.

the gelding, to which Mrs. Favero replied, "What do you mean? I talked to Tony . . . It wasn't done by a vet." ECF No. 23 at ¶ 18.

According to Plaintiff, Defendants performed the castration, and, soon after the castration, Defendants trailered Indio and delivered him to Mr. Gordon's property in Oregon. ECF No. 7-1 at 5, ¶ 24. Upon arrival, the horse was "not faring well and was taken to Bend Equine Medical Center (BEMC) that same day." Id. at ¶ 26; ECF No. 21 at ¶ 32. "After extensive treatment, [Plaintiff] was informed that [the horse's] intestines had ruptured and that it would be in Indio's best interest to be humanely euthanized." ECF No. 21 at ¶ 33. According to Plaintiff, "[o]ne of the veterinarians who cared for Indio expressed to [her] that Indio's colic was a complication of the inhumane castration he experienced at Mr. Favero's hands (and/or at his direction)." ECF No. 21 at ¶ 34. Plaintiff recounts that, "[a]fter his death, [she] saw photographs taken at BEMC of Indio's scrotal area and his intestines. Those images, and the discussion with the veterinarian, caused [her] great mental anguish." ECF No. 21 at ¶ 35. BEMC sent a bill for the veterinary services to Plaintiff for $9,824.85, and Plaintiff paid the bill. ECF No. 21 at ¶ 37.

Plaintiff contacted Mr. Favero and relayed her frustrations. ECF No. 25-1 at 5-6. Mr. Favero "did not deny castrating Indo and apologized." ECF No. 25-1 at

5-6. Defendants offered to reimburse the costs and pay the vet bill. ECF No. 19 at 5. But Plaintiff wanted more.

Plaintiff filed a complaint on February 14, 2018. ECF No. 1. Plaintiff filed an Amended Complaint on March 15, 2018 (ECF No. 6) and a Revised Amended Complaint on April 4, 2018[3] (ECF No. 7-1). Plaintiff is asserting a claim for (1) damage to livestock pursuant to RCW 4.24.320, (2) conversion/trespass,[4] (3) violation of the Washington Consumer Protection Act (CPA), (4) breach of contract, (5) breach of bailment, (6) breach of implied warranties of merchantability and/or fitness for a particular purpose, and (7) civil conspiracy to violate RCW 4.24.320, convert, and/or trespass. ECF No. 7-1 at 8-9, ¶¶ 40-46. Plaintiff requests (1) economic and (2) non-economic damages, (3) treble damages under RCWs 4.24.320 and 19.86.090, (4) attorney fees under RCWs 4.24.320 and

---

[3]     The Revised Amended Complaint also names Does 1-10 as Defendants. ECF No. 7-1. The Court's Scheduling Order required they be named by July 16, 2018 and thereafter timely served. They were not, so Does 1-10 are not parties to this action.

[4]     Although Plaintiff cites cases discussing trespass, Plaintiff does not actually argue trespass – as opposed to conversion – actually applies. In any event, Plaintiff did not have a property interest at the time of the alleged trespass.

19.86.090, and (5) injunctive relief enjoining Defendants from engaging in acts of animal cruelty, performing veterinary medicine without a license, from performing scrotal ablation/castration procedures on any equine, and from engaging in "the aforementioned deceptive and/or unfair practices related to the handling and sale of equine." ECF No. 7-1 at 9-10.

Defendants now move the Court to dismiss the action. Defendants argue (1) the amount in controversy does not meet the minimum threshold of more than $75,000, ECF No. 10 (28 U.S.C. § 1332(a)), and (2) complete diversity is lacking because TMFER is a necessary party that destroys complete diversity. These Motions are now before the Court.

## DISCUSSION

Defendants argue Plaintiff's claim does not meet the jurisdictional amount of more than $75,000 because Plaintiff is, at most, only entitled to recovering the value of the horse and related expenses, including the veterinarian bill, amounting to roughly $11,000.00. ECF No. 10. The Court agrees.

Whether Plaintiff's claim meets the jurisdictional amount hinges on (1) what claims are viable and (2) what damages are available as a result. Here, Plaintiff clearly has a viable breach of contract claim because Defendants delivered non-conforming goods to Plaintiff. *See* RCW 62A.2-715. However, as discussed

below,[5] the remaining causes of action are not viable, so Plaintiff is only able to recover for the breach of contract. The Court will discuss why the claims are not viable, and then discuss why the breach of contract claim and the value of the requested injunction do not satisfy the minimum jurisdictional amount.

I.   **VIABILITY OF CLAIMS**

   A. **RCW 4.24.320**

RCW 4.24.320 gives the owner of livestock a cause of action for damages resulting from acts described RCW 16.52.205 (animal cruelty), 9A.56.090 (theft of livestock in the first degree), 9A.56.083 (theft of livestock in the second degree), 17.52.320 (malicious killing or causing substantial bodily harm). As discussed below, Plaintiff was not the owner of the horse at the time of the castration because, before delivery, Plaintiff did not acquire any property rights under the UCC or otherwise. As such, Plaintiff does not have a viable statutory claim for damage to her livestock.

   1. *Property interest under the UCC*

Plaintiff did not gain an ownership interest under the Washington Uniform

---

[5]   The Court does not discuss Plaintiff's claims for civil conspiracy to violate RCW 4.24.320 and conversion/trespass because there are no underlying violations.

Commercial Code (UCC).[6]  Under the Washington UCC, title passed from

Defendants to Plaintiff when Defendants delivered the horse in Oregon—after the

castration was performed—because (1) the parties did not have an explicit

agreement otherwise,[7] RCW 62A.2-401(2) (passage of title statute), and (2) course

of dealing and usage of trade do not supplant the default rule on title unless the

parties expressly agree course of dealing or usage of trade are incorporated.[8]  The

---

[6]      Article 2 of Title 62A "applies to transactions in goods[.]"  RCW 62A.2-

102.  "Goods" means all things "which are movable at the time of identification to

the contract for sale . . . ."  RCW 62A.2-105(1).  The horse at issue is a good

within this definition.

[7]      Plaintiff conceded this point at oral argument.

[8]      2 Quinn's UCC Commentary & Law Digest § 2-401[A][6] (Rev. 2d ed.)

("This default rule differs from other Article 2 default rules in that it may only be

displaced by an explicit agreement, not by an implied-in-fact agreement (e.g.,

usage of trade, course of dealing)."); *First Nat. Bank of Elkhart Cty. v. Smoker,*

287 N.E.2d 788, 789 (Ind. App. 1972) (explaining trade usage and course of

dealing do not supplant the rules under Section 2-401 because Section 2-401

expressly states the section "govern[s] all situations in which title becomes

material and where other provisions of the chapter do not specifically cover the

buyer does attain a "special property" and "insurable interest" that attaches upon purchase of the goods to be delivered, RCW 62A.2-501(1)). However, the "special property and insurable interest" merely refers to "incidents . . . defined in provisions of [Article 2] such as those on the rights of the seller's creditors, on good faith purchase, on the buyer's right to goods on the seller's insolvency, and on the buyer's right to specific performance or replevin." RCW 62A.2-401, cmt. 3. It does not give Plaintiff any property interest sufficient to support a statutory damage or conversion action. *See In re G. Paoletti, Inc.*, 205 B.R. 251, 262 (Bankr. N.D. Cal. 1997) ("The only right this 'property interest' gives a buyer is the right to possession of the goods under certain circumstances. If the buyer does not exercise this right and the goods are sold, the buyer has no right to any portion of the sale proceeds. Thus, a buyer's special property interest is more accurately described as an equitable remedy than a property interest.").

--------

situation and do not refer to such title" and "[t]he provisions of the chapter dealing with custom and usage in the trade and the course of dealings between the parties do not specifically refer to title[,]" so the trade usage and course of dealing provisions "cannot be construed as covering such situations when title becomes material.").

Plaintiff also points to the "risk of loss" remaining with Defendants until delivery under the UCC and argues "[t]his means [Defendants] were liable to [Plaintiff] for the cruelties inflicted upon Indio" and that "[b]earing such risk of loss (i.e., being legally responsible to her for the loss) further establishes why she is the" owner. ECF No. 37 at 6-7. However, the risk of harm only refers to whether the seller must pay damages for non-delivery or provide substitute goods, but this merely references the damages available for breach of contract. *See* Mitchell Stocks, *Risk of Loss Under the Uniform Commercial Code*, 87 Nw. U. L. Rev. 1415, 1416 (1993) ("if a seller bears the risk of loss at the time the goods are damaged and has not insured against such loss, the seller may have to pay damages for nondelivery or provide substitute goods. [UCC § 2-711]. Likewise, if a buyer bears the risk of loss at the time the goods are damaged and has not insured against such loss, the buyer may still have to pay the full purchase price. [UCC § 2-709(1)].") (footnotes omitted). This remedy does not create a property interest.

Plaintiff argues the passage of title statute is not applicable in determining ownership under non-UCC claims. As Plaintiff correctly points out, the comments to Section 2-401 note that the section "in no way intends to indicate which line of interpretation should be followed in cases where the applicability of 'public' regulation depends upon a 'sale' or upon location of 'title' without further definition." However, the comment continues to state it is "necessary to state what

a 'sale' is and when title passes under this Article in case the courts deem any public regulation to incorporate the defined term of the 'private' law."  As such, courts may consider the passage of title statute in certain circumstances.

Importantly, Division 3 of the Washington Court of Appeals relied upon Section 2-401 in determining who had title for the very purpose of determining who could bring suit for negligent transportation.  *See Rogers Walla Walla, Inc. v. Willis Shaw Frozen Express, Inc.*, 23 Wash. App. 540, 543 (1979); *see also* RCW 62A.2-401 (Washington Comment: "The Washington court has resolved still other problems by first locating title.").  As such, Washington courts have relied on the UCC passage of title provision for determining ownership for purposes of standing in a tort case.  So have other Courts.  *See, e.g., N. Carolina Nat. Bank v. Robinson*, 336 S.E.2d 666, 672 (N.C. App. 1985) ("Although the cause of action is the tort of wrongful conversion, the rights of the parties revolve around their relationships as commercial actors.  This is not an automobile accident case; rather it involves a business transaction in which the policies underlying the private UCC law are fully implicated.").  This makes sense for issues involving the parties' contractual agreements, as it is the parties' express agreement that determines when ownership passes.

Comment 4 of Section 2-401 also gives good reason for relying on Section 2-401 in determining ownership interests beyond the UCC context.  As comment 4

explains, where the seller is to deliver the goods, the time of delivery is "the time

upon when the seller has finally committed himself in regard to specific goods."

As such, there is no final commitment before delivery of the goods, evidencing the

ownership interest stays with the seller.  Although a Court may later force the

transfer of ownership rights by specific performance in certain situations, there is

nothing to suggest this remedy constitutes a property interest.  *See In re G.*

*Paoletti, Inc.*, 205 B.R. at 262.

Because Washington has relied on the UCC in determining non-UCC

claims and the ownership rights are intimately connected to the underlying

contractual agreement, the Court finds Section 2-401 is instructive for determining

passage of title and related ownership interests of the parties as to the remaining

claims.  In any event, Plaintiff did not acquire any property rights under the UCC,

and, as discussed below, Plaintiff has not established that she acquire any property

rights otherwise.

2. ***Property rights outside of UCC***

Plaintiff argues that, even if Section 2-401 is applicable for determining

passage of title, the concept of ownership under RCW 4.24.320 is broader than one

who holds title.  Plaintiff asserts the definition of "owner" under RCW

16.52.011(2)(o) governs the damage to livestock statute because it references two

statutes from Chapter 16.52 (RCWs 16.52.205 and 16.52.320) as a basis for

liability under the Act. *See* RCW 4.24.320. Under RCW 16.52.011, an "owner" is defined as "a person who has a right, claim, title, legal share, or right of possession to an animal or a person having lawful control, custody, or possession of an animal."

The Court finds the definition of owner under RCW 16.52.011 is not applicable under the damage to livestock statute. First, other than the reference to sections describing actionable conduct under Chapter 16.52, there is nothing to suggest the legislature intended this definition to apply to RCW 4.24.320. Second, the two referenced sections that are found in Chapter 16.52 do not use the term "owner" at all. Third, the definition under criminal law does not comport with common sense as to who should be able to bring a civil damage claim, as the term "owner" under RCW 16.52.011 includes those who merely have lawful possession of an animal. Defining ownership broadly may make sense in the criminal context, where the statute is written to criminalize conduct, but it does not make sense in the civil context, where the statute is providing a private cause of action to an aggrieved party. If the definition did apply, someone that was merely in possession of an animal, but had no actual ownership interest, would be able to pursue a civil damage action; presumably, so would every other person fitting the incredibly broad description, including the true owner. In short, this framework for owner, which was crafted specifically for the criminal context, is not fit for civil

actions. For the same reasons, the Court declines to look at ownership as used in the context of embezzlement. *See* ECF No. 36 at 7-8.

Even if RCW 16.52.011 applied, Plaintiff did not have a sufficient interest necessary for bringing the civil damage action. Plaintiff argues "[t]he evidence abounds that [Plaintiff] had a *right*, *claim*, *legal share*, and *right of possession to* Indio" at the time of castration, but Plaintiff only points to (1) the special property interest under the Code (discussed above), (2) documents filled out by a third-party veterinarian listing Plaintiff as owner/consignee/consignor, and (3) the remedy of specific performance. ECF No. 36 at 5.

First, the special property interest is not a property interest at all, *see In re G. Paoletti, Inc.*, 205 B.R. at 262, as discussed above, let alone one that would support a civil damage action. Similarly, the remedy of specific performance is just that: a remedy. The potential right to specific performance does not establish an ownership interest. *See Id.* Plaintiff did not provide any support for the proposition that specific performance – assuming it would be available for a wild horse – constitutes a property interest, and the Court declines to find such a property interest in the absence of any legal support or actual argument on the matter. *See* ECF No. 36 at 8-9.

Second, Plaintiff does not provide any support for the proposition that Plaintiff acquired a property interest as a result of a third-party veterinarian listing

Plaintiff as owner or consignee/consignor on the Equine Infectious Anemia

Laboratory Test and Certificate of Veterinary Inspection, which occurred before

Plaintiff paid for the horse.  Importantly, the issue must be considered in the

context of the sale of goods.[9]  Where there is no legal support for such a

proposition, and where the result could have a significant impact on property rights

and liability in the market-place, the Court declines to adopt Plaintiff's novel

argument.

### 3. *Conclusion*

The Court finds Plaintiff does not have an interest sufficient to state a claim

under RCW 4.24.320.  Plaintiff did not gain any property rights from the contract,

as the title had not passed, and Plaintiff has not demonstrated she otherwise

acquired a property right to the horse until delivery.  *See Durland v. San Juan Cty.*,

182 Wash. 2d 55, 70 (2014) ("Constitutionally protected property interests may be

created either through (1) contract, (2) common law, or (3) statutes and

regulations.").

### B. **Conversion; Trespass**

Plaintiff argues Defendants are liable for conversion for their part in

---

[9]     Animals are considered property in Washington.  *Sherman v. Kissinger*, 146
Wash. App. 855, 870 (2008), as amended (Nov. 18, 2008).

castrating the horse.  Because animals are considered property, *Sherman v. Kissinger*, 146 Wash. App. at 870, the analyses for conversion should proceed in the same manner as any other good for purposes of ownership.  Under this lens, it is clear that Plaintiff does not have a viable cause of action for conversion because (1) she lacked a sufficient ownership interest and (2) there was no actual dispossession of property.

### 1. *Plaintiff did not have an interest necessary for conversion*

Plaintiff argues the tort of conversion "does not turn on title at all, but instead, on possessory rights[,]" and asserts that "a person with a future interest may also bring an action for conversion."  ECF No. 36 at 8-9 (citing *Restatement (Second) of Torts* § 243).  Plaintiff baldly states that she "no doubt . . . had a right to demand specific performance to enforce her legally protectable interest[,]" presumably arguing this establishes a future interest sufficient to assert a tort for conversion.  ECF No. 36 at 9.  Plaintiff provides no case law in support of the proposition that the remedy of specific performance is a future interest that would allow Plaintiff to sue for conversion, as noted above.  *See* ECF No. 36 at 9.

The Court finds Plaintiff's proposition unsupportable.  *See In re G. Paoletti, Inc.*, 205 B.R. at 262.  Notably, neither the illustrations from the Section 243 of the *Restatement*, nor the Washington case citing this Section support Plaintiff's position, as they all concern future interests transferred pursuant to agreements, as

opposed to a supposed future interest stemming from the potential remedy of specific performance.  Without any support, and in light of the potential impact it could have on the market-place,[10] the Court declines to find Plaintiff has a sufficient interest to proceed with a claim for conversion.  Notably, if Plaintiff's position were adopted, whether one has a sufficient property interest to pursue a claim for conversion would depend on the nature of the goods (whether they are so unique that specific performance would be available), which appears to be an odd result in and of itself.  However, even if Plaintiff had a sufficient property interest, Plaintiff's claim for conversion would otherwise fail.

### 2.  *Plaintiff does not have a viable claim for conversion*

"A conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it."  *Judkins v. Sadler-Mac Neil*, 61 Wash. 2d 1, 3–4 (1962) (citation omitted).  "An essential element of conversion is the taking of possession, actual or constructive, of the chattel."  *Repin v. State*, 198 Wash. App. 243, 270 (2017) (citing *Martin v. Sikes,* 38 Wash.2d 274, 287 (1951)).  "In its ordinary sense, conversion means to take and keep another's property."  *Id.* (citing *Hess v.*

---

[10]    Plaintiff's position would turn many simple contract breaches into tort claims for conversion.

*Starwich,* 149 Wash. 679, 684 (1928)). "[T]he essence of conversion is the dispossession of property from the rightful owner." *Id.* at 271. "Nevertheless, even a willful or an unlawful taking will not always amount to conversion[;]" as "[t]here must be some assertion of right or title hostile to the true owner." *Id.* at 270-71 (citing *Clark v. Groger,* 102 Wash. 188, 194 (1918)).

Here, Plaintiffs' claim for conversion fails because there was no "dispossession of property from the rightful owner[,]" whether actual or constructive, which is "the essence of conversion[.]" *Repin* 198 Wash. App. at 271. It is undisputed that Plaintiff never possessed the horse and that Defendant was not going to relinquish possession until delivery of the horse. Before delivery, Defendant performed the complained-of gelding. There was no dispossession because Plaintiff did not possess the property before the act and Plaintiff was given possession precisely according to the Parties' agreement.

Importantly, Plaintiff does not provide any support for the proposition that a buyer of goods has a tort claim for conversion against the seller for goods damaged before delivery. The Court declines to adopt such a novel approach, especially when it blurs the lines between a claim for breach of contract and the tort of conversion. Plaintiff's position would render the essential requirement of dispossession inert and would extend liability for conversion that goes far beyond the "letter or purpose behind the cause of action for conversion . . . ." *See id.* at

270 (no claim for conversion where veterinarian "engage[d] in gross negligence during treatment of a companion animal or when the veterinarian disobeys instructions for care of the animal" because the "claim does not fulfill the letter or purpose behind the cause of action for conversion . . .").

Notably, in deciding *Repin*, the court observed that, out of the many examples discussing conversion in the Restatement (Second) of Torts § 228, "[n]one of the examples given under § 228 . . . concern gross negligence or failure to follow contract instructions when caring for an animal. . . . The examples involve putting the chattel to a significant use other than authorized, such as one renting a car that ferries passengers, but using the car to haul heavy freight. In all examples, the defendant exclusively possess the chattel and applied the chattel to her own use." *Repin*, 198 Wash. App at 272. This comports with Washington case law, as the Washington courts have denied a claim for conversion in the context of a failure to perform contractual services: (1) in *Spokane Grain Co.*, because the defendant never "sought title to the horse[] or to permanently deprive [plaintiff] of possession of the equine[]," *Repin*, at 273 (discussing the basis for finding there was no conversion in the case of *Spokane Grain Co. v. Great Northern Exp. Co.*, 55 Wash. 545 (1909), which involved a carrier contract to transport horses that were damaged in the course of transportation); and (2) in *Repin*, because the defendant never "sought to use [the animal] for [his] own pleasure[,]" *Id.* at 272.

Plaintiff cites *Criscuolo v. Grant Cty.* for the proposition that one need not take and keep another's property in order to constitute conversion, ECF No. 31 at 5, but the Court is not relying on this principle and, in any event, the case of *Criscuolo* is distinguishable. In *Criscuolo*, an officer shot the plaintiff's dog and the owner filed suit, proceeding on a claim for conversion. *Criscuolo v. Grant Cty.*, No. 10-CV-0470-TOR, 2014 WL 527218, at *11 (E.D. Wash. Feb. 10, 2014). The defendant moved for summary judgment on the issue of conversion, arguing the officer had lawful justification in shooting the dog. *Id.* The Court disagreed. The Court cited the following rule of law:

> The tort of conversion is 'the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it.'

*Id.* Although not discussed in the case, there was certainly a dispossession of property, as the plaintiff there owned the dog and was actually with his dog at the time the officer shot and killed it.

Given this framework, and the fact that Plaintiff did, in fact, authorize "some care being given", the Court finds Plaintiff does not state a viable cause of action for conversion. *See Repin*, 198 Wash. App. at 271.

C. **Breach of Bailment**

Plaintiff did not submit any additional briefing on the issue of bailment. As discussed above, Plaintiff did not own the horse at the time of the complained of

conduct, nor was there any change of possession, so Plaintiff's claim for breach of

bailment fails as a matter of law. *See Judkins*, 61 Wash. 2d at 3-4 (claim for

bailment only proper when there is a "change of possession [from owner to

defendant]. . . sufficient to constitute a delivery.").

D. **Consumer Protection Act**

Plaintiff's CPA claim also fails. Washington's CPA provides that "[u]nfair

methods of competition and unfair or deceptive acts or practices in the conduct of

any trade or commerce are hereby declared unlawful." RCW 19.86.020; *Panag v.*

*Farmers Ins. Co. of Washington*, 166 Wash. 2d 27, 37 (2009). "To prevail in a

private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or

practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4)

injury to a person's business or property, and (5) causation." *Panag*, 166 Wash. 2d

27, 37 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.,* 105

Wash.2d 778, 784 (1986)). Critically, Plaintiff makes almost no effort in support

of the CPA claim by way of argument or evidentiary support. *See* ECF Nos. 6

(Complaint, revised at ECF No. 7-1); 19 at 21-22 (Response); 31 (Plaintiff's

Motion for sur-reply); 36 (Supplemental Response).

Among other things, Plaintiff has failed to establish the public interest

element. Plaintiff failed to present any evidence of, or even argue that, a

substantial portion of the public would be affected by Defendants' conduct. As

such, the Court finds Plaintiff has failed to demonstrate that there is a substantial

potential for repetition with respect to Defendants castrating horses it sells despite

representing to customers that they will have a veterinarian perform the castration.

"The public interest element . . . may be established in one of two different

ways. [citation omitted]. Specifically, (1) through a per se claim, or (2) by the

plaintiff satisfying a factor derived from the *Hangman Ridge* case." *Evergreen*

*Moneysource Mortg. Co. v. Shannon*, 167 Wash. App. 242, 260 (2012). As such,

because Plaintiff "has not pleaded or asserted a per se claim[,]" Plaintiff "must

offer evidence to satisfy a *Hangman Ridge* factor" identified below. *Id.*

"Ordinarily, a breach of a private contract affecting no one but the parties to

the contract is not an act or practice affecting the public interest." *Hangman*

*Ridge*, 105 Wash. 2d at 790; *Behnke v. Ahrens*, 172 Wash. App. 281, 293 (2012).

However, "[i]t is the likelihood that additional plaintiffs have been or will be

injured in exactly the same fashion that changes a factual pattern from a private

dispute to one that affects the public interest." *Id.* To establish the public interest

element, the plaintiff must show there is "a real and substantial potential for

repetition, as opposed to a hypothetical possibility of an isolated unfair or

deceptive act's being repeated." *Id.* at 295. In determining such, "[w]here the

transaction was essentially a consumer transaction," the following *Hangman Ridge*

factors are relevant to establish the public interest element:

(1) Were the alleged acts committed in the course of defendant's business?
(2) Are the acts part of a pattern or generalized course of conduct?
(3) Were repeated acts committed prior to the act involving plaintiff?
(4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff?
(5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?

*Hangman Ridge*, 105 Wash. 2d at 790.

The only factor that could possibly swing in Plaintiff's favor is the first, as Defendants' conduct was committed in the course of Defendants' business. However, there is no evidence – neither does Plaintiff argue – that the act was part of a pattern or generalized course of conduct. Indeed, there is nothing to suggest the complained of conduct occurred before or that Defendants will repeat the act in the future. Notably, although Plaintiff states in her Revised Amended Complaint that Mr. *Favero* offered to geld the horse, this offer appears to have only been extended *after* Plaintiff requested the services be performed before delivering the horse. ECF No. 7-1 at ¶¶ 16-18.

Ultimately, while Defendants apparently sell horses in the ordinary course of business, there is no suggestion that they normally geld the horses before selling, nor, more importantly is there any suggestion they do so despite telling the customer the castration would be provided by a veterinarian. As in *Behnke*, "[t]he evidence in the record . . . does not bear out [a] claim of repetitive nondisclosure"

so Plaintiffs have failed to establish that the alleged deceptive act "was repeated with . . . other [buyers] or was likely to be repeated with other future [buyers]." 172 Wash. App. at 296.

## II.   **Damages from Breach of Contract; Injunction**

Because Plaintiff has a viable claim for breach of contract and also requests injunctive relief, the amount in controversy is the damages available for the breach and the pecuniary value – either to the Plaintiff or the Defendants – of the enforcement or lack of enforcement of the injunction.

### A.  **Breach of Contract Damages**

As to the breach of contract claim, RCW 62A.2-714 lists the damages available to a buyer for breach in regard to accepted goods:

> (1)  Where the buyer has accepted goods and given notification (RCW 62A.2-607(3)), he or she may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2)  The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3)  In a proper case, any incidental and consequential damages under the next section may also be recovered.

The following section provides:

> (1)  Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and

custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

    (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

    (b) injury to person or property proximately resulting from any breach of warranty.

RCW 62A.2-715. In Washington, emotional damages and attorney fees are not recoverable for a breach of contract claims. *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wash. 2d 426, 446, 448 (1991) (emotional distress damages not proper for breach of contract claim even though they might be foreseeable);[11] *Mellor v.*

---

[11]    Notably, the case of *Womack v. Von Rardon*, allows the *owner* of an animal to recover emotional damages for "malicious injury" to that animal. 133 Wash. App. 254, 263, (2006). However, this case, and the related line of cases do not apply because they are limited to valuing the loss of personal property (which includes animals) resulting from acts that occurred <u>while the plaintiff owned</u> the animal. *See Sherman v. Kissinger*, 146 Wash. App. at 861. Further, there is nothing here to suggest that Defendants conduct was done maliciously. *See State v. McCracken*, 194 Wash. App. 1050 (2016) ("Malice" and "maliciously"

*Chamberlin*, 100 Wash. 2d 643, 650 (1983) (no attorney fees for breach; attorney fees only available if there is a "statutory or other recognized right to an award of attorney fees").

As such, Plaintiff can only recover, at most, the difference in market value between a horse as contracted for and the horse as delivered, along with the costs of delivery and related veterinary bills. The available damages to Plaintiff for the breach of contract is thus limited to around $11,000.

B. **Value of Injunction**

The value of an injunction is included in determining whether a plaintiff's claim meets the minimum jurisdictional amount in controversy. "Under the 'either viewpoint' rule, the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce. *In re Ford Motor Co./Citibank (S. Dakota), N.A.*, 264 F.3d at 958 (citing *Ridder Bros. Inc., v. Blethen,* 142 F.2d 395, 399 (9th Cir. 1944)). "In other words, where the value of a plaintiff's potential recovery is below the jurisdictional amount, but the potential cost to the defendant of complying with the injunction exceeds that amount, it is the latter that represents the amount in controversy for jurisdictional purposes."

---

are defined as "an evil intent, wish, or design to vex, annoy, or injure another person.").

Here, Plaintiff seeks to enjoin Defendants from engaging in acts of animal cruelty, performing veterinary medicine without a license, from performing scrotal ablation/castration procedures on any equine, and from engaging in "the aforementioned deceptive and/or unfair practices related to the handling and sale of equine." ECF No. 7-1 at 9-10. It is clear that Plaintiff would not enjoy any pecuniary benefit from the injunction. Plaintiff's bald statement that the "value of ending scrotal ablations by unlicensed individuals failing to use analgesia, anesthesia, or sedation is valued far beyond $75,000[,]" ECF No. 19 at 8, merely refers to an emotional, not pecuniary benefit. As for Defendants, because the injunction amounts to an interference with its business affairs, "[t]he value of [the injunction] is measured by the losses that will follow from the [injunction]." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). Plaintiff has not presented any evidence that the injunction would result in any pecuniary loss to Defendants. Indeed, even if the injunction were proper, and even if there were evidence Defendants performed the complained-of operation routinely, the pecuniary impact would be minimal, at best, and in no way could it come close to the roughly $64,000.00 needed in damages to close the gap between the breach of contract damages and the jurisdictional amount.

//

//

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants Anthony H. Favero and Marcene K. Favero's Motion to Dismiss for Lack of Jurisdiction (ECF No. 10) is **GRANTED** without prejudice to filing in State Court.

2. Defendants Anthony H. Favero and Marcene K. Favero's Motion to Dismiss for Lack of Complete Diversity (ECF No. 16) is **DENIED AS MOOT**.

3. Plaintiff Larraine Reeves Morrison's Motion to Shorten Time, Strike, Allow Sur-reply, and for Oral Argument (ECF No. 31) is **GRANTED in part** and **DENIED in part**.

The District Court Executive is directed to **enter** this Order, **enter** judgment for Defendants, **furnish** copies to counsel, and **close** the file.

**DATED** September 12, 2018.



THOMAS O. RICE
Chief United States District Judge